## ANALOGIC CORPORATION vs. BOARD OF ASSESSORS OF PEABODY.

No. 96-P-1364.

Suffolk. March 19, 1998. - October 9, 1998.

Present: BROWN, GREENBERG, & SPINA, JJ.

*Taxation,* Real estate tax: abatement, assessment, value; Appraisers. *Value.*

The Appellate Tax Board did not abuse its discretion by relying on the taxpayer's expert's appraisal of real property, and to the extent the board credited that testimony, its decision was based on substantial evidence. [607-608]

The Appellate Tax Board properly relied on the capitalization of income method, rather than the comparable sales method, to determine the fair market value of a hotel for all five tax years in question. [608-611]

An abatement matter concerning a hotel property was remanded to the Appellate Tax Board for reconsideration of the taxpayer's claim of certain non-realty item deductions against income and consideration of the amount of net income attributable to nonrealty assets that represents a return on capital. [611-613]

The Appellate Tax Board did not err in relying on the taxpayer's actual replacement reserves, required by a hotel management agreement, in computing the taxpayer's income stream for purposes of the income capitalization approach to valuation of the taxpayer's hotel property. [613-614]

The Appellate Tax Board's finding that, for tax valuation purposes, a manufacturing facility's vacancy rate was three percent for each of the six tax years in question was not supported by substantial evidence and, on remand, the assessment of the facility was to be redetermined using vacancy rates based upon the record. [614-615]

An abatement matter concerning a manufacturing facility was remanded for a reconsideration of capitalization rates and recalculation of net operating income, where the Appellate Tax Board had used the wrong methodology in making its calculation of value. [615]

Substantial evidence supported the determination of the Appellate Tax Board of the appropriate capitalization rate applicable to a manufacturing facility for tax valuation purposes. [616]

APPEAL from a decision of the Appellate Tax Board.

*Ronald C. Kaczynski* for the defendant.

*Mark J. Witkin* for the plaintiff.

SPINA, J. The parties have filed cross appeals from a decision of the Appellate Tax Board (board) granting real estate tax abatements totaling $1,483,339.27 for fiscal years 1989 through 1994 from taxes levied against a hotel and a manufacturing facility in Peabody owned by Analogic Corporation (Analogic). On appeal, the assessors challenge (1) the sufficiency of the evidence presented by Analogic in support of abatements for its hotel, and (2) the board's failure to consider their evidence of comparable sales in arriving at its valuation of the hotel. In regard to the valuation of the hotel, Analogic challenges the board's (1) disallowance of certain deductions from income, and (2) permitted allowance for replacement reserves. It also disputes three of the board's findings in regard to the manufacturing facility: (1) a vacancy rate that was too low; (2) the failure to apply the amortized costs of expenditures for tenant improvements and leasing commissions; and (3) the reduced capitalization rate for fiscal years 1993 and 1994.

Analogic manufactures electronic measurement and detection equipment for the health care industry, such as fetal and physiological monitors, and CAT scan devices. It also manufactures telephone switching and other electronic equipment. In the early 1980's it acquired 67.493 acres through the Peabody Community Development Authority and constructed a two-story, 407,209 square foot manufacturing facility at the site under an Urban Development Action Grant (UDAG). It is the sole occupant of that facility.

Pursuant to its obligation under the UDAG to increase local employment, Analogic built a six-story, 257-room full service hotel on 7.493 acres of the original tract. The hotel, owned by Analogic and managed by the Marriott Corporation, was thirty percent finished as of January 1, 1989 (the assessing date for fiscal year 1990) and fully complete by August, 1989, when it opened.

Analogic seasonably applied for real estate tax abatements for fiscal years 1989 through 1994 as to the manufacturing facility, and 1990 through 1994 as to the hotel, all of which the assessors denied. Timely appeals were made to the board, pursuant to G. L. c. 59, §§ 64, 65. The board consolidated the appeals and, after an eleven-day hearing, granted abatements for both facilities for each year sought.

1. *The assessors' appeal.* a. *Sufficiency of the evidence.* The assessors contend that Analogic failed to produce sufficient substantial evidence to rebut a presumption of validity of the assessments for the hotel. See *Schlaiker* v. *Assessors of Great Barrington*, 365 Mass. 243, 245 (1974). In particular, they argue that the testimony of Analogic's appraiser was based upon data furnished by an employee of Marriott, an interested "party,"[1] and therefore was susceptible to a claim, unspecified and undeveloped, of bias.

The "presumption" of which the assessors speak, however, is not a "true presumption," but merely a "restat[ement] that the taxpayer bears the burden of persuasion of every material fact necessary to prove that its property has been overvalued." *General Elec. Co.* v. *Assessors of Lynn*, 393 Mass. 591, 599 (1984). The "substantial evidence," upon which the board's decision must rest, *New Bedford Gas & Edison Light Co.* v. *Assessors of Dartmouth*, 368 Mass. 745, 749 (1975),[2] is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. 456, 466 (1981) (citations omitted). "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Ibid.* (citations omitted).

The assessors do not argue that the data upon which Analogic's appraiser relied was inadmissible. See *Department of Youth Servs.* v. *A Juvenile*, 398 Mass. 516, 531-532 (1986); *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 480 (1991).[3] There is no requirement that an appraiser be the source of the data upon which his opinion rests. Compare *General Elec. Co.* v. *Assessors of Lynn*, 393 Mass. at 601. Data furnished by interested parties is not inadmissible per se, and is commonly used as the basis for opinion testimony by appraisers. See

---

[1]Marriott was not a party to the proceedings before the board. Under their management agreement, Marriott was required to pay real estate taxes levied against the hotel on behalf of Analogic, as a deduction against operating profits in the accounting between them.

[2]Although the board is exempt from the provisions of the State Administrative Procedure Act, G. L. c. 30A, § 1, it is subject to "general principles affecting administrative decisions and judicial review of them." *Assessors of New Braintree* v. *Pioneer Valley Academy, Inc.*, 355 Mass. 610, 612 n.1 (1969).

[3]We note that the ordinary rules of evidence apply in board proceedings. See *Boston Gas Co.* v. *Assessors of Boston*, 402 Mass. 346, 349 (1988).

*Revere* v. *Revere Constr. Co.*, 285 Mass. 243, 248-249 (1934) (valuation of realty may be determined in part by evidence of business profits); *Sinoyan* v. *Massachusetts Turnpike Authy.*, 348 Mass. 780 (1964) (gross receipts of bowling alley relevant to issue of valuation). Interested parties are often the only practical source of necessary data. Compare and contrast *Barshak* v. *Buccheri*, 406 Mass. 187, 191 (1989) (plaintiff's expert relied on the testimony of the defendant as to the condition of the property). The reliance on Marriott's data did not render the testimony of Analogic's appraiser inadmissible or subject to disqualification. Compare *Assessors of Pittsfield* v. *W. T. Grant Co.*, 329 Mass. 359, 361 (1952). It merely went to the issue of his credibility and the weight to be given his testimony. See *New Eng. Tel. & Tel. Co.* v. *Assessors of Boston*, 392 Mass. 865, 870 (1984); *General Elec. Co.* v. *Assessors of Lynn*, 393 Mass. at 600-602.

We have reviewed the entire record and considered that which the assessors argue detracts from the weight of the evidence. Beyond their general claim of bias, the assessors direct us to no particular deficit either in the testimony of Analogic's appraiser or in the data from Marriott upon which he relied. At trial, they did not impeach his testimony on the issue of bias they now raise. Their own appraiser relied upon much the same data as the basis for his opinions. Analogic's appraiser was knowledgeable and, the assessors concede, qualified. He was familiar with the subject property, the comparables he considered, and the economic conditions of the area. His opinions were not excludable guesswork. See *General Elec. Co.* v. *Assessors of Lynn, supra* at 602. We cannot say that the board abused its discretion by relying on Analogic's appraiser, as it did, in its decision. *Ibid.* To the extent it credited his testimony, the board based its decision on substantial evidence.

b. *Failure to consider comparable hotel sales.* The assessors contend that the board erred by failing to consider evidence of comparable sales in valuing the hotel.[4] At trial, the assessors never argued that the comparable sales method should have been used to value the hotel for fiscal years 1992, 1993, and 1994. They are, therefore, precluded from raising the issue on

[4]Experts in the field of real estate appraisal generally use three methods to calculate fair market value: (1) the comparable sales method, (2) the capitalization of net income method, and (3) the depreciated reproduction cost method. *Correia* v. *New Bedford Redev. Authy.*, 375 Mass. 360, 362 (1978).

appeal as to those years. G. L. c. 58A, § 13. See *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. at 459. They have preserved the issue as to fiscal years 1990 and 1991.

The board may rely upon any method of valuation that is reasonable and supported by the record, *Blakeley* v. *Assessors of Boston*, 391 Mass. 473, 477 (1984), and it is "not required to believe the testimony of any particular witness." *Assessors of Quincy* v. *Boston Consol. Gas Co.*, 309 Mass 60, 72 (1941). It found that the capitalization of income method was the most appropriate for determining the fair market value of the hotel for all five years. The board also found the comparable sales method to be useful, but only as a check on the income capitalization method "because of the lack of truly comparable sales within the market during the relevant years." The depreciated reproduction cost method was deemed inappropriate, and neither party challenges that finding.

The assessors' appraiser found no sales that he considered suitable for valuation for fiscal years 1992, 1993, and 1994; and Analogic's appraiser found none for any year within the relevant five-year period. Both appraisers expressed a preference for the income capitalization method for the hotel, but the assessors' appraiser rejected that method for fiscal years 1990 and 1991 because he considered the hotel too new to have any experience as income property for those years. The assessors cite three sales which their appraiser considered appropriate for purposes of applying the comparable sales method for fiscal years 1990 and 1991, and which they argue are determinative. Those sales involved ongoing businesses, and the assessors' appraiser admitted under cross-examination that he had made no effort to separate the value of the real estate from the enterprise value[5] of each sale, for comparison purposes. See Appraisal Institute,

_____

[5]"Appraisers are often asked to value properties which include property components that are not real property. For example, hotels include a significant amount of furniture, fixtures, and equipment which would often be classified as personal property. When there is a business enterprise associated with the property (as in the case of a hotel), the price investors are willing to pay may also include a premium over the value of the real property for what is referred to as business enterprise value.

"Business enterprise value is a value enhancement that results from items of intangible personal property such as marketing and management skill, an assembled work force, working capital, trade names, franchises, patents, trademarks, non-realty related contracts or leases, and some operating agreements. Going-concern value is the value created by a proven property opera-

The Appraisal of Real Estate 578-579 (11th ed. 1996). Further, those sales involved hotels less than half the size of the subject hotel. They were sold to Marriott as a package, and there was some indication that Marriott may have paid a premium for their combined strategic presence in the area. There was a basis for finding that they were not comparable sales.

The income capitalization method "is frequently applied with respect to income producing property." *Taunton Redev. Assocs.* v. *Assessors of Taunton,* 393 Mass. 293, 295 (1984). Its proponent must establish the existence of an income stream which "adequately reflect[s] earning capacity" for purposes of its application. *Pepsi-Cola Bottling Co.* v. *Assessors of Boston,* 397 Mass. 447, 451 (1986). Analogic's appraiser considered the financial data for the hotel adequate, in view of the hotel's affiliation with a national chain, to establish an income stream for purposes of applying the income capitalization method beginning with the August, 1989, opening of the hotel. His method for developing a stabilized income stream for the hotel was based upon "The Uniform System of Accounts for Hotels," recommended by the American Hotel and Motel Association, and used generally in the industry. There was evidence that the general real estate market in the area experienced a significant downward trend during the fiscal years in question, which, together with the nature of the hotel as income property, would lead the typical hotel investor to rely upon the income capitalization method to inform his decision to purchase the hotel. The record supports the board's acceptance of valuation based on the income capitalization method for all five years.

Contrary to the assessors' claim, the board did consider their evidence of comparable sales. It simply viewed that evidence, as it was entitled, see *New Boston Garden Corp.* v. *Assessors of Boston,* 383 Mass. at 469, to be less persuasive than the evidence supporting valuation under the income capitalization method.

The assessors claim, for the first time on appeal, that a $16

tion with income sufficient to pay a fair return to all the agents of production. It consists of the total value of the real property; personal property such as furniture, fixtures and equipment; and intangible personal property, or the business enterprise. Properties with a business value component include hotels and motels, restaurants, bowling alleys, nursing homes, and other labor-intensive operations." (Emphasis deleted.) Appraisal Institute, The Appraisal of Real Estate 453 (11th ed. 1996).

million release deed to the hotel dated August 8, 1991, should have been considered by the board as the best evidence of the hotel's value. The release deed was the result of Analogic's buy-out of its venture partner's interest in the hotel following a work-out agreement between Analogic, its venture partner, and the Federal Deposit Insurance Corporation. The evidence indicated that the stated consideration included personal property, intangible assets, $5 million in guarantees by Analogic for its venture partner's obligations, and only $6.7 million for the hotel. Neither the assessors' appraiser nor their trial counsel ever asked the board to consider the release deed as evidence of a comparable sale. As trial counsel conceded, it did not represent an arm's length transaction and was not offered as evidence of a comparable sale. It was used solely to test Analogic's expert's knowledge of background details. The issue is deemed waived. See *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. at 459. Nevertheless, the board properly could have declined to give the release deed any weight. See *id.* at 469. There was no error.

2. *Analogic's appeal in regard to the hotel.* a. *Disallowance of deductions.* Analogic contends that the board erred by rejecting, without any objectively adequate reason, the evidence as to the appropriateness of deductions for inventories, pre- and post-opening expenses (training and start-up costs), working capital, and investment value which it claims qualify as specific applications of the general principle permitting deductions for business expenses and interests.

Under the income capitalization approach, valuation is determined by dividing net operating income by a capitalization rate. See *Assessors of Brookline* v. *Buehler*, 396 Mass. 520, 522-523 (1986). Net operating income is calculated by subtracting "operating expenses from gross *rental income.*" *Id.* at 523 (emphasis added). The income capitalization approach can provide a somewhat comfortable fit when used to value the more common income producing properties such as industrial, office or apartment buildings, or shopping centers, uses which often involve long or medium term leases or tenancies, which generate "rental income" for the owners. Hotels present unique problems to appraisers. They tend to be labor intensive businesses which derive only a portion of their income from daily room (space) occupancies. They derive other income from services and sales of such items as food and alcohol. See Ap-

praisal Institute, The Appraisal of Real Estate 488 (11th ed. 1996). This "other income," if not attributable to the realty, is not "rental income" for purposes of valuation under the income capitalization method. See *id.* at 489.

Analogic presented uncontradicted evidence of expenses it was required to pay Marriott, under their management agreement, for the opening of the hotel ($514,000), for initial inventories ($62,965), and to establish a working capital account ($257,000) to stabilize the income stream against fluctuations due to occurrences such as the lag time in payments from credit card companies. Analogic also presented uncontradicted evidence that these items were intangible assets, separate from the realty,[6] but which contributed to the production of income for the hotel.[7] Analogic presented evidence that it had not recaptured the cost of these assets from income, and that the income its appraiser used to calculate value was income from the entire business, net of departmental expenses. It sought to deduct an amount from income representing a fair return on those assets.[8] Without analysis, the board rejected those requests as "unprecedented" and "lack[ing] proper foundation."

Analogic's case for these items was neither unprecedented nor without foundation. These assets are part of the hotel's business enterprise value,[9] and an investor could reasonably expect a return on his non-realty investment capital. Compare *Taunton Redev. Assocs.* v. *Assessors of Taunton*, 393 Mass. at 295. Had Analogic borrowed the money for the outlays in question, the debt service for the loan would, in all likelihood, have been allowed as a deductible expense. Analogic merely sought to recover as a return on its own money an amount comparable to what a lending institution would have expected to recover for the same money, in the form of a deductible expense. Analogic's isolation of non-realty income and expenses comported with the Uniform Standards of Professional Appraisal Practice. See Appraisal Institute, The Appraisal of Real Estate 578-579

---

[6]The extent to which the working capital account was used for realty versus non-realty purposes was not established. However, because of the result we reach, Analogic was entitled to a fair return on a working capital account for both purposes, so separate accounting was not required.

[7]See note 5, *supra.*

[8]It also sought a deduction for a return on the hotel's "investment value," a non-capital asset.

[9]See note 5, *supra.*

(11th ed. 1996). As presented, the issue warranted the board's fully reasoned consideration. Compare *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. at 470-471.

On remand, the board must consider the substance of this issue. We do not specify what non-realty assets must be approved, or the amount of any deduction. Those matters are for the board to decide, subject to judicial review. Compare *Alstores Realty Corp.* v. *Assessors of Peabody*, 391 Mass. 60, 65 (1984) (minor promotional expenses having a direct commercial benefit for tenants of shopping center, approved by the board, upheld). See *Assessors of Brookline* v. *Buehler*, 396 Mass. at 531 (the board's recognition of the replacement of worn out roofing, heating equipment, and electrical fixtures as ordinary expenses rather than capital improvements, upheld). The board may also consider the amount of net income attributable to non-realty assets which represents a return on capital so invested.

b. *Replacement reserves in regard to the hotel.* Analogic contends that the board erred by rejecting the allowance for replacement reserves which its appraiser used to develop a stabilized income stream for the hotel and, instead, relied upon the actual replacement reserves required by Marriott under their management agreement. It argues that reliance upon the actual replacement reserves under the management agreement, which because the hotel was new increased over the first ten years before stabilizing at five per cent, is logically inconsistent with the concept of a stabilized income stream.

The board was not required to adopt every aspect of a witness's testimony. *Assessors of Quincy* v. *Boston Consol. Gas Co.*, 309 Mass. at 72. The board was entitled to compute the income stream, a concept not susceptible of determination with mathematical precision, by exercising its independent judgment from the record before it. *Ibid.* It was free to accept the income capitalization approach, discussed *infra*, but it was also free to reject underlying computations made in support of that method and substitute its own or other computations having basis in the record. See *Assessors of Lynnfield* v. *New England Oyster House, Inc.*, 362 Mass. 696, 700-701 (1972). The board was justified in relying on the actual replacement reserves, as called for by a hotel management company with a successful national

track record. There was no error.[10]

3. *Analogic's appeal in regard to the manufacturing facility.*
a. *Vacancy rate.* Analogic assigns error to the board's selection
of a vacancy rate of three percent for the six years it applied the
income capitalization method of valuation to the manufacturing
facility. It argues that the board's finding was not supported by
substantial evidence. See *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. at 465-466.

The board based its finding "on market data in evidence for
the type of property and the Board's own expertise."[11] That
data included industrial vacancy rates for Peabody and the north
suburban market area for the six fiscal years, as follows:

| Date | Peabody | North Suburban |
|------|---------|----------------|
| 1/1/88[12] | 15.1% | 13.0% |
| 1/1/89 | 7.0% | 21.2% |
| 1/1/90 | 7.0% | 24.8% |
| 1/1/91 | 7.3% | 26.3% |
| 1/1/92 | 2.0% | 24.0% |
| 1/1/93 | 0.0% | 17.8% |

The board found that three percent would be an appropriate
vacancy rate for each year. While the board has great latitude in
its fact-finding power, the findings must be anchored in the rec-
ord. That is, subsidiary facts found by the board generally must
be within the range of the testimony. See *id.* at 471-472. Here,
the board's finding of a three percent vacancy rate for the last
two years fell within the range of vacancies of combined data
for Peabody and the north suburban area, but it was outside the
range of the data for the first four years. Averaging the vacancy
rates of the years does nothing. Cf. *Assessors of Brookline* v.
*Buehler*, 396 Mass. at 530. Having declared its reliance on the
market data, the board's findings cannot be saved by the
testimony of the assessors' appraiser, which consisted of an
unimpressive averaging of his "experience" with vacancies,
unsubstantiated by any data or municipal inventory of industrial

[10]Analogic has asked for double costs and attorneys' fees for having to
respond to what it claims was a frivolous appeal by the assessors. The
complexity of this issue illustrates why that appeal was not frivolous.

[11]The Spaulding and Slye Report. Peabody was considered to be in the
State's north suburban market area.

[12]January 1, 1988, is the assessing date for fiscal year 1989.

vacancies. While there was substantial evidence about the dismal economic health of the region as might justify a finding outside the range of figures in the data, see *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. at 473, it could only support an opinion of vacancy rates above the range of data. Nor can the board's "expertise" and judgment provide a basis for finding facts outside the evidence. See *ibid.*

The vacancy rates for fiscal years 1989, 1990, 1991, and 1992 are not based on substantial evidence. Accordingly, the assessment of the manufacturing facility for those years must be redetermined using vacancy rates based upon the record.

b. *Failure to apply certain amortized costs.* The board accepted expenses for tenant improvements and leasing commissions for the manufacturing facility, but instead of subtracting them from income, "subsumed" them within the capitalization rate. That methodology is erroneous. Those items are variable operating expenses, see Appraisal Institute, The Appraisal of Real Estate 491-492, 495-496 (11th ed. 1996), and, as such, are deductible from gross rental income to obtain net operating income. See *Assessors of Brookline* v. *Buehler*, 396 Mass. at 522-523, 531. Under the income capitalization method of valuation, the net operating income is then divided by a capitalization rate to obtain the fair cash value of the property. *Id.* at 552-523. The capitalization rate is determined by an independent calculation, based upon different and separate factors representing "the return on investment necessary to attract investment capital." *Taunton Redev. Assocs.* v. *Assessors of Taunton*, 393 Mass. at 295. The board must first deduct allowed expenses from income, then calculate the capitalization rate independently.

Analogic argues against remanding the matter to the board for a redetermination of the capitalization rates, claiming that the board adopted the calculations of Analogic's appraiser in arriving at the capitalization rates (with the exception of fiscal years 1993 and 1994, discussed in the next section), and did not actually quantify its subsumption of the tenant improvements and leasing commissions. While there is much to be said for this position, it is not clear that this was the case. The board was not required to show how it determined the capitalization rates, and in this case it did not. See *Assessors of Lynnfield* v. *New England Oyster House*, 362 Mass. at 700. Accordingly, the matter is remanded for a reconsideration of the capitalization rates as well as a recalculation of net operating income by deducting tenant improvements and leasing commissions.

c. *Capitalization rate.* Analogic contends that the board erred by reducing the capitalization rates applied to the manufacturing facility for fiscal years 1993 and 1994 based upon "[t]he decreased cost of money in the market place." It argues that its appraiser's uncontradicted testimony indicated that a reduction in lending rates during those years resulted in higher levels of collateralization which in turn increased an investor's risk *and*, of significance, the investor's expected return on capital.

The board was not required to accept Analogic's appraiser's testimony in its entirety. See *Assessors of Quincy* v. *Boston Consol. Gas Co.*, 309 Mass. at 72. There was substantial evidence upon which the board could have settled on the capitalization rates it did. There was no error.

4. *Conclusion.* The decision of the board is reversed, and these matters are remanded to the board for further proceedings consistent with this opinion.

*So ordered.*